**Phone (410) 299-9681**
rayobrocki@verizon.net

# *Raymond C. O'Brocki*

### *Attorney at Law*
### *Certified Fire Investigator*

**821 Lynvue Road**
Linthicum, Maryland 21090

December 14, 2020

<u>*Via Email*</u>
hlcardin@aol.com
davidnmabreylaw@gmail.com

RE:     Summary of Findings: USA v. Jamie Clemons, RDB-19-0438

## <u>METHODOLOGY</u>

The methodology that was used in my investigation was a systematic approach using the scientific method outlined in Chapter 4 of NFPA 921.

**Recognize the need**: I was approached by Mr. David Mabry to review documents related to the fire that occurred at 9129 Fort Smallwood Road, Pasadena, MD 21122 on July 28, 2017.

**Define the problem**: The problem is that a fire occurred, no one was present to witness how the fire started and that a thorough investigation is needed to determine the origin and cause of the fire to the exclusion of all other causes.

**Collect data**: Data was collected, and the following materials were reviewed:

Anne Arundel County Fire Department Report of Origin and Cause Analysis
Anne Arundel County Police Report
ATF- Report of Investigation
ATF- Property Status Summary Report
ATF- Advanced Mobile Device Report
ATF- Laboratory Reports
ATF- Audio/ Video Laboratory Exam Requests
Anne Arundel County Fire Department Inspection Violation Notices
Anne Arundel County Fire Safety Inspection Notices
Anne Arundel County Building Permit information

All photographs taken by the investigation given to the defense
All videos taken by the investigation given to the defense

**Analyze the data**: I analyzed the data; I could not conduct a site visit because the structure had been demolished. However, NFPA 921 clearly states in Section 4.4.3.3,

> *The use of previously collected data from a properly documented scene can be used successfully in an analysis of the incident to reach valid conclusions through the appropriate use of the scientific method, Thus, the reliance of previously collected data and scene documentation should not be inherently considered a limitation in the ability to successfully investigate the incident.*

**Develop a hypothesis**: I developed a hypothesis that the fire originated in the attic space above the men's bathroom. Burned for a substantial period of time eventually burning through the roof deck and dropping down in certain areas.

**Test the hypothesis**: Using deductive reasoning I compared the hypothesis to known facts while applying scientific knowledge relevant to this incident. I could not exclude all possible fire causes due to the fact that the Anne Arundel Fire Marshal's Office never recovered or tested electrical fixtures from the bathroom ceiling in the attic area and I couldn't have them examined by an electrical engineer.

**Developed a new hypothesis**: That the fire was intentionally set and occurred in a manner consistent with the Anne Arundel Fire Marshal's report.

**Test the hypothesis**: Using deductive reasoning I compared the hypothesis to known facts while applying scientific knowledge relevant to this incident. I could not exclude all possible fire causes, specifically the possibility of an electrical fire.

**Final hypothesis**: NFPA 921 Section 4.3.6 states "that if no hypothesis can withstand an examination by deductive reasoning the issue should be considered undetermined." This fire should be ruled an undetermined fire because no one cause can be named to the exclusion of all other causes proven to "reasonable degree of scientific and engineering certainty."[1]

## <u>REPORT OF FINDINGS</u>

**The Investigation and Timeline**

• The fire was reported via fire alarm company at 3:06am.

• 1st arriving unit arrived at 3:13am.

• Fire reported "knocked" (extinguished) at 3:22am.

• Heavy fire reported in attic at 3:33am.

---

[1] Guide for Fire and Explosion Investigations, NFPA 921 section 4.5.3, 2017 Ed.

This timeline is consistent with a theory of the fire causation that has the fire originating in the attic and breaking out to the exterior in an eave over the side "B" wooden walkway. The subsequent "drop down" of burning materials falling on the walkway and handrail that was covered with a rubber mat. If the fire originated on the exterior (as hypothesized by the A.A. County Investigators) and traveled into the attic area, the fire in the attic should have been relatively smaller compared to the fire on the exterior.

The Fire Department reports responding and extinguishing the exterior fire in 9 minutes and 11 minutes later "heavy fire" was reported in the attic. "Drop Down" can explain the unusual fire patterns that Lt. Halpern reports. "Drop down" is defined in NFPA 921 as "The spread of fire by the dropping or falling of burning materials." Lieutenant Halpern, in addition to unusual burn patterns, also mentions several times "areas of noncommunicating fire damage" as part of his case for an incendiary fire.

Drop down can cause areas of non-communicating fire. NFPA 921, 6.3.3.2.10 states, "Burning debris can fall and burn upward, creating a new pattern from the heat source…Drop down can ignite other combustible material, producing low burn patterns."

Another cause of "areas of non-communicating fire damage" are overloaded electrical wiring. NFPA 921 section 24.2.1.2 states

> *Separate fires that are not caused by multiple deliberate ignitions can result from the following:*
>
> *(1) Fire spread by conduction, convection or radiation*
> *(2) Fire spread by flying brands*
> *(3) Fire spread by direct flame impingement*
> *(4) Fire spread by falling flaming materials (i.e. drop down)*
> *(5) Fire spread through shafts, such as pipes chases or air conditioning ducts*
> *(6) Fire spread within wall or floor cavities within "balloon construction"*
> *(7) Overloaded electrical wiring*
> *(8) Utility system failures*
> *(9) Lightning*
> *(10)   Rupture and launching of aerosol containers*

Lt. Halpern reported that a firefighter was injured when a "backdraft" occurred. NFPA 921, 3.3.17 defines a backdraft as "a deflagration resulting from the sudden introduction of air into a confined space contain oxygen deficient products of incomplete combustion." Backdrafts occur where there is fire in a confined space (attic) that raises the temperature of the combustible materials to a point and then the oxygen depleted fire starts to die down, the temperature remains high and then there is a rapid introduction of air (firefighters ventilating the roof/attic) and the highly heated smoke explodes. Backdrafts are slow to develop, the fire needs to ignite the combustible materials, burn to a high temperature, start to be depleted of oxygen and then have air suddenly introduced. It would be unusual for a backdraft to occur under the State's theory

where the fire originates on the exterior then break into the attic from the outside.  It makes more sense if a backdraft occurred that the fire originated in the attic slowly, superheated the smoke and gases in the attic, burned its way out of the attic at a weak spot in the eave on the "B" side. Slowly became depleted of oxygen and the backdraft occurred when the fire suppression crews ventilated the roof. If a "Backdraft did occur it could explain unusual fire patterns.

The investigation never considered electrical fire in the attic. The report makes no mention of the electrical wires in the attic area. Pictures show unsecured wires and improperly secured wires running through the attic space. (See Appendix- Pictures #5 and #8) The report does mention "the exposed ceiling joists displayed charring and mass loss from the top sides and down, saddle burns, indicating a top down fire progression within the attic space." This would be consistent with an electric fire in the attic starting slowly into a steady state fire.

Saddle burns are defined in NFPA 921, 6.3.7.12 as "distinctive U-or saddle shaped patterns sometimes found on the top edges of floor joists. They are caused by fires burning downward through the floor of the affected joist. Ventilation caused by floor openings may also contribute to the development of these patterns." Saddle burns do not occur quickly, they take time to form more consistent with a slow-moving fire originating in the attic, rather than a fast-moving ignitable liquid fueled fire burning in from the exterior.

This report makes no attempt to exclude electrical as a potential cause of this fire. The report references stains on the roof that they theorize were from an ignitable liquid. If they were caused by an incendiary device, why weren't these stains ignited and formed burn patterns on the roof?

I will testify that the several non-communicating areas of fire can be explained with accidental causes and the timeline leading up to the "backdraft" injuring the firefighter indicates a slower developing fire more consistent with an electrical fire than a firebombing.

**Expectation Bias**

While responding Lt. Halpern reported that he notified the ATF and the K9 handler of the fire, essentially dispatching them to the fire prior to his arrival.

 *While responding, I made notification of the fire to Lt. B.P. Mayers #606 ATF ADC Handler "K.9 Spice" and ATF SIAD. Giblin. Inv. Orsini and I responded and arrived separately at the scene of a commercial building fire.*[2]

When he arrived at the scene, he contacted Lt. Peel on the fireground, Lt. Peel was the first arriving fire unit officer who told him he had noticed something "unusual" Lt Halpern reports:

> *I made contact with Lt. Peel, the fire officer from first arriving Engine l04. Lt. Peel advised that they pulled past the front of the building and turned into the parking area positioning Engine 104 which was located adjacent to the Bravo/Charlie corner of the fire building. He advised they located fire on the exterior of the Bravo side and quickly extinguished it. Lt. Peel said that he thought it was odd that as he walked up to the fire he noticed a floor mat burning out in front of the Bravo side door. He said that after they extinguished the fire, he placed an orange cone over the mat to help protect its location*

---

[2] Halpern, M.J, Report of Origin and Cause Analysis, dated 08/03/2017, pg.3

> *until I arrived Lt. Peel thought the burning floor mat was unusual and reported his*
> *findings to the Incident Commander. A determination of the fires origin and cause could*
> *not be determined by on scene units, resulting in FIB being requested.*

Before the investigation started, Lt. Halpern called for the accelerant detecting dog, the ATF and spoke with a first responder who could not determine the cause or origin of the fire but informed Lt. Halpern that he noticed "odd" and unusual" fire behavior.

NFPA 921 section 4.3.9 discusses "expectation bias." It reads:

> *Expectation bias is a well-established phenomenon that occurs is scientific analysis when*
> *investigators reach a premature conclusion without having examined or considered all of*
> *the relevant data. Instead of collecting and examining all data in a logical and unbiased*
> *manner to reach a scientifically reliable conclusion, the investigator uses the premature*
> *determination to dictate investigative processes, analyses, and ultimately, conclusions, in*
> *a way that is not scientifically valid. The introduction into an investigation results in the*
> *use of only the data that supports this previously formed conclusion and often results in*
> *the misinterpretation and/or the discarding of data that does not support the original*
> *opinion. Investigators are strongly cautioned to avoid expectation bias through the*
> *proper use of the scientific method.*

The dispatching of the K-9 and the ATF prior to arrival suggests that Lt. Halpern at a minimum suspected arson as the fire cause. He was further influenced by Lt. Peel's remarks regarding unusual or odd fire behavior. I was trained to (when practicable) examine the scene before talking to witnesses to avoid "expectation bias." A standard procedure for the ATF when investigating large fires is to split the investigation team into two divisions: one division to conduct the interviews and one division to examine the scene. In this method scene examiners are not influenced by witness statements and they use witness statements to substantiate what was revealed during the scene examination. This is the most effective way to avoid "expectation bias." This did not occur here because the ATF was not the lead agency in the investigation, Anne Arundel County Fire Department lead the investigation.

Because of this expectation bias on the part of Lt. Halpern, he sought out only data to prove his premature determination. His report makes no mention of examining the electric in the attic, doesn't mention breakers on the electrical panel that were tripped, doesn't retain or photograph electrical fixtures in the area of the heaviest fire damage in the attic and never fully eliminates electric as a cause. His report never mentions unpermitted remodeling of the bathrooms that occurred in 2017 and only mentions data that supports its conclusion of arson.

**Unpermitted Bathroom Remodel**

An interview conducted with Keith Plews (DOB 12/11/76) on 11/2/2020 revealed that Mr. Plews participated in an unpermitted complete remodel of the men's bathroom of Coconut Charlie's in February of 2017. (See Appendix- Pictures #9 thru #14) He left for Florida soon after completion of the men's room and the other workers finished the women's bathroom. He stated that "Jimmy" did the floor and wall framing, "Florida Rob" did the electrical and plumbing, and that he completed the tile work. A check with the Anne Arundel County Building Department

revealed that no permits were applied for or obtained, and the work was never inspected. Mr. Plews stated that the gentleman that performed the electrical work installed an exhaust fan and light fixtures in the ceiling. The wiring side of these fixtures were in the attic. The bulk of the fire damage in the attic is in the area over the bathrooms (See Appendix- Pictures #1 and #2). None of the workers were licensed contractors and none were Master electricians, plumbers, or mechanical.

**Evidence**

I will offer testimony as to the pink garden glove and as to how gloves can retain gasoline on them from many uses. Under the Government's theory the glove in evidence would likely to have ignited during the throwing of the Molotov Cocktails and display burns.

It is doubtful the High's cups (if used as Molotov Cocktails) would survive or only be slightly melted if filled with gasoline and thrown with a lit wick. I will offer my opinion as to the Government's video demonstration   that a filled cup thrown on the roof would not roll off a roof of that pitch. I will offer testimony that I'm not in agreement with the video re-enactment of how the Government theorizes the start of the fire. I will offer testimony that the glove recovered was a left-handed glove when Mr. Clemmons is well known to be right handed.

As to the re-enactment video, nothing in the video conclusively proves arson. The flashes in the video could be the result of many other causes, vehicle headlights, reflections, etc. The report states that you can see ignitable liquid "raining down" when the video does not clearly support that, i.e., the "raining down" could be "drop down" that was misidentified as an ignitable liquid. The timeline of the video (Camera #9) is simply the opinion of the fire investigator reported as fact. The Field Test is not a valid test. Said test is not scientific, and more amateurish in its overall presentation. The video is not an accurate representation of their hypothesis. The placement on the simulated "pitch roof" is not thrown as hypothesized as the wick in the video is gently lit after the cup was gently placed on the roof.  The simulated roof was not fully covered with shingles and the small shed is not similar to the roof of the bar. If thrown, the top of the cup would have popped off.

I will offer testimony to the effect that Accelerant Detecting K-9 Dogs are rewarded for "hitting" on accelerants with food- incentive. To challenge issues such as "when was the dog last fed?" Dogs cannot differentiate between intentionally placed accelerants and accidental spills and innocently transferred ignitable liquids. Dogs are trained to "hit" on alcohol perfumes and colognes containing alcohol.

## <u>ORIGIN OF THE FIRE</u>

It appears that the fire originated in the attic area above the bathroom area, as evidenced by the heavy charring of wooden structural members in that area. (See Annex- picture #18). Ventilation efforts by fire suppression units which cut a hole in the roof to release hot gases and smoke for the fire engine crews to safely enter the structure and suppress the fire. (See Annex- picture #15) The other effect of the ventilation is to draw the fire in the attic towards the hole cut in the roof, which caused intense fire damage in that area.

In the area of origin were several unsupported wires and the electrical fixtures illegally mounted in the ceiling of the bathrooms, including recessed lights and exhaust fans.

Examination of an electrical panel showed four (4) circuit breaker tripped: Breakers 5,6,8, 10. (See Appendix- Picture #16). Breaker 10 is labeled "Recess Lts" which most likely means recessed lights.

## **CONCLUSION**

Using the "systematic approach' mandated by NFPA 921 2017 edition, I conducted a thorough fire investigation. I reviewed all reports, pictures and videos involving the fire at Coconut Charlies. I analyzed the fire patterns, keeping in mind the impact of the fire suppression efforts had on fire movement. I developed hypothesis to reveal the origin and cause of the fire. I tested the hypothesis. Neither hypothesis could be proven to the exclusion of all other. The fire should have been ruled as undetermined. I will testify that the investigation by Lt Halpern, was tainted by "expectation bias" and did not consider and sufficiently eliminate all possible accidental causes for the fire and because of that key evidence was not retained.

I will testify that the several non-communicating areas of fire can be explained with accidental causes and the timeline leading up to the "backdraft" injuring the firefighter indicates a slower developing fire more consistent with an electrical fire than a firebombing.

*Raymond O'Brocki*

Raymond C. O'Brocki III, Esq.
Certified Fire Investigator

## **APPENDIX**

**Picture #1**



R-AACFD-0049

**Picture #2**



R-AACFD-0145

**Picture #3**



R-AACFD-0148

**Picture #4**



R-AACFD-0147

**Picture #5**



R-AACFD-0152

**Picture #6**



R-AACFD-0153

**Picture #7**



R-AACFD-0154

**Picture #8**



R-AACFD-0155

**Picture #9**



Bathroom remodel

**Picture #10**



Bathroom before remodel

**Picture #11**



During Bathroom remodel

**Picture #12**



Outside Bathroom remodel

**Picture #13**



Bathroom remodel roughed in wiring

**Picture #14**



Bathroom remodel

**Picture #15**



Fire crews working on the roof of Coconut Charlie's

**Picture #16**



Misc-Photo-0108

**Picture #17**



Misc- Photo-0109

**Picture #18**

